The first case today is Nabel Autobody Center v. Country Mutual Insurance. For the appellant, we have Mr. Beeman. For the appleant, Mr. Heidenreich. You may proceed. Thank you. Good morning. Good morning. Mr. Heidenreich, Mr. Lee. However, we have taken great care in preparing a fair estimate of charges for all parts and services needed to properly repair your vehicle. The only part of that sentence that is not objectively verifiable as false is the word however. Everything else is a total falsehood. And the defendants know it. They know because they have testified that removal and installation of trim is required to do a proper job. And yet their policy is to not include that in the estimate. There may be two or three people here that aren't old enough to remember, but there are other people that are old enough to remember. A failed franchise called Earl Scheib. It was the home of the $39.95 paint job for a car. It no longer exists because how they would do that, they would not remove and reinstall trim. Instead, they would slap tape over the nameplate, the chrome, the mirrors. They wouldn't remove anything, and they'd paint the car. And eventually, the franchise went out of business because people gradually came to realize that it's not worth $39.95, this paint job. When my trim is painted, the paint is shipping off because it doesn't seal with the trim, and it's not a proper way to fix a car. Country Mutual knows that, too. But that's what they do. They also don't include blending, soundproofing, corrosion protection, or rustproofing in their initial estimate, which the plaintiffs have testified is necessary for a proper repair. They also say they've taken great care in preparing the estimate. Now, this is a person in the social and literal context here. Has his car damaged. Is going to someone that they trust, their insurer, to give them information. And they're telling them, we prepared a fair estimate. And careful estimate. They've taken great care. The reality is, if the hood doesn't open, they don't open it. The trunk isn't accessible. They don't open the trunk. They don't even look inside. In fact, in one of the instances mentioned in the brief, the appraiser, it was raining. He didn't want to look at the car. But then he fills out a supplemental statement that goes only to the company. What's that supplemental statement say? That goes only to the company? Hey, this car is going to need a lot more work. There's more damage here. Do they tell that to the customer? No. They tell the customer, hey, we've taken great care in preparing a fair estimate of all the parts and services necessary to properly repair your car. They also say, most shops agree to complete repairs for the amount of our estimate. There is nothing about that statement that is not objectively verifiable as false. In fact, think about it. The appraiser is giving the vehicle owner a letter along with an estimate that says, most shops agree to complete the repairs for the amount of our estimate. In reality, in many, many cases which are cited in our brief, the appraiser is saying to himself, there is no shop in the world that will repair the car for this amount. And they have admitted that. So whether it's a statement or opinion of fact, there's three elements to look at. Whether the statement has a precise and readily understood meaning, all parts and services, that's pretty well understood. All parts and services. Most shops have completed for this estimate. That's pretty well understood. The second thing you look at is whether the statement's literary or social content indicates it contains facts. They're trying to convince this person this estimate is a real estimate and not a bogus estimate. Mr. Beeman, let's say we agree with you that these are statements of fact and not opinion. What about the next issue? Okay. I'm going to drop that issue and I'm going to go on to the next one. I'm not sure what you're... Hypothetically, let's say we agree with you. Okay. I'm not sure what the next one is, but... Well, let me help you. Specifically, the issue of whether or not you can show that your clients lost business as a result of this practice, that customers didn't go to them. Am I correct, Justice Clark? Okay. Right. Okay. And I mentioned, I think that Country Mutual may have mentioned this as well in their argument. So I was prepared to argue that. There are several ways. There's not just one way of proving damages. Now, there's two counts here. One is intentional interference with business, and it has, if you read the elements, there's no requirement that a specific transaction be proven. Also, the restatement of torts has no specific. The only cases, and each and every case that mentions you have to show a specific person who lost business, is founded on a case that never said that. There is no case that isn't on a foundation of quicksand. There is no case that says, that can relate back to an actual case that says you have to have a specific person who was harmed. Many cases are proven by losses, by an overall loss of business. And in this particular case, during the time, the false statements, the false body shop letters, the false estimates, the suggestion that plaintiff's shops were dishonest, and you remember from the brief, people said, you know, they use parts that aren't needed, they cheat on other things, don't go here, just blatantly don't go here. Take your car somewhere else. While all these suggestions are going on, Cannable Auto Body's business with insurance and claimants of country went from 21.9% to 9.1%. Gas Auto Body business with insurance and claimants went from 35.3% to 19.3%, just on page 37 of my brief. And American Auto Body business with insurance and claimants went from 19.2% to 7.4%. But how do you show that that was a result of what country was doing? Okay, there's a couple. You know, you have an expert. We have an expert, but actually, we have an expert that can show the damages decrease. But everything about these businesses, including the affidavits of the owners, is they were doing everything else the same. This is a percentage of business from all of their revenue. So everybody that comes in from State Farm, from Allstate, from GEICO, from everybody else, and private business, the percentage of business from the people that are perpetrating these lies has gone down dramatically. But aren't there other factors or variables that could impact that? Probably are, but not to that extent. It's circumstantially a no-brainer. If you look at Shantz versus Abbott Laboratories, for instance, which I pointed out in my brief, and that's the Supreme Court telling us. The Supreme Court has given us guidance on what kind of damages are admissible. In that case, there wasn't one theater owner that said, I didn't go to this theater because there was a bad smell. Not one. The Supreme Court said it's permissible to apportion damages based upon loss of gross earnings. They didn't consider anything else. Taxes, cost of doing business, nothing. No new theaters came to town. No new theaters. They didn't consider that either. So our case is far stronger than the Shantz versus Abbott Laboratories case because we have considered some of those things. We've considered all our business. We're doing it on net revenue. We're considering the percentage loss based upon this. That is going about ten steps further than the theater owners did in the Shantz case, which the Supreme Court said is the proper way of doing damages. That case has not been reversed. It's the law in Illinois. So I think that we're bound by that. And that is another way of proving damages. Now, the question is, the question is, because there's two counts, can that carry the day in the tortious interference case, where there is suggestion that, well, there is suggestion in the cases, although the cases are citing precedent that doesn't exist, the cases say you've got to have a specific transaction symbol. In the Consumer Fraud and Deceptive Businesses Act, there is no such requirement. Can I go back to Shantz for a minute and those other cases? Those were all motion to dismiss cases and not motions for summary judgment. So you're at a different stage of litigation than they were in that case. Now, those are directed toward the intentional interference, and that's correct. All the cases I cited, Volkswagen and the other ones, were motion to dismiss stage. But that being said, you have to have a prima facie case in order to proceed at any level. Right, but that's different than showing you have evidence. Well, you know, you have to state a claim. You have to state a claim. You have to show some damage. And I believe we have shown it, and we have shown it to an extent far greater and far clearer than the Shantz case showed. Right, but I guess the point I'm trying to make is, even in the Shantz case, that was at the motion to dismiss stage. So the burden on the plaintiff at that point is lighter than it is at summary judgment, basically. In terms of bringing forward evidence. Right. No, my recollection of the Shantz case is it was summary judgment. It was summary judgment in favor of the theater owner. That was reversed by the appellate court. And then the Supreme Court said, hey, guess what? That is fine evidence. That is good enough evidence because all you need to do is to create some kind of framework from which damages can be calculated. And whether those – the jury may say or judge may say, you know what, I think there's other factors. I don't accept it. You're going to get zero or you're going to get less than you want. That could happen. But it's not. That's for the trier of fact. That's not – it's like the Shantz case. That's for the trier of fact. And that was a summary judgment case. So it went all the way to a decision. And we're kind of at the same thing here. This is a summary judgment case. Although for a long time the judge ruled that we had the evidence, we had everything we needed to have, and then switched his mind two weeks before the trial or less than two weeks before the trial. And certainly he has that right. But you can tell there's a – he wasn't sure. He decided the case in our favor for a long time. And the defense has no answer to the Shantz v. Lab's case that I saw in there. No adequate answer to that Supreme Court case that says, you know, if we had just showed a gross loss in income and all these false statements, go to trial. That's basically what Shantz says. We've shown a lot more than that. We've specifically shown the percentage loss compared to all our revenue over the exact same time that these false statements, these don't go to this body shop statements, these people are doing work that's not required, they're cheating you, statements are being made. So we have an issue with the intentional interference because of the specific – which if you read them, you'll see I'm right. They're all based on Parkway Bank that never said you have to have a specific case. But it certainly is a stronger argument for the defense in the intentional interference case. It's no argument in the consumer fraud case because the consumer fraud case does not require that. All the elements of the tort of intentional interference require is an intentional, a reasonable expectation of business, country's knowledge of that expectancy, which they obviously knew. They're giving these letters to people who live in Vernon and Springfield and Highland, Illinois, where these body shops are located. In the very town where they're located, they're giving these people these false information. So they obviously know it. It's purposeful. How can you say it's not purposeful when they say don't go to that body shop? I mean, that's pretty blunt. The body shop does unnecessary work. The body shop overcharges. And you know they want this is all driven by profit. And we know that because one of their former employees, Robert Cannell, said, hey, this whole thing was profit driven. And he used to be an adjuster. He was above the appraisal level. He was an adjuster. And he said, hey, we had this list, and if nobody had a request, he said, go to one of these that never has a supplement. And if you wanted any more evidence, and he said if you go to a good body shop like Cannable's, then we give him this letter to try to discourage him. But when it comes down to it, Mr. Cannell's car is hurt. Where does he go? He goes to Cannable because he knows it's a good body shop, even though the letter strongly indicates they're cheaters and liars. I thought there was something either in the record or in the briefs that indicated your clients really didn't want to pursue a strategy of looking for people who had switched to other body shops to repair their vehicles. Well, I think there's truth to that because here's why. Let's say we put up a billboard. If you've gotten a letter and didn't come to us, call this number. And maybe we could do some kind of investigation that way. And maybe we'd pick off 10 or 15 people who thought it was more important to get involved in somebody else's lawsuit than go to work. Yeah, maybe we'd get a few people to say that. Not enough to justify standing here today. Maybe we'd get $5,000, $6,000 in people that would say that. There's not enough to justify. There's no way to undo the lies other than to figure damages based upon what our percentage loss has been with these companies over this exact same time that their lies were being perpetrated against these companies. There's just no other way to do it financially and economically reasonable. So, yes, there was a strategy to do that. Could we have gotten a few people? Yeah, we probably could. In fact, in the brief, there's some people that say they took their business away because of this, because of what was said, but not enough to justify damages that would put us in anything other than behind the eight ball. Well, what I was thinking was a pattern of conduct. You know, if you had 6 to 10 people who said, yes, I took my business elsewhere, you could maybe establish a pattern of conduct that would bolster your expert's testimony that it was the result of the loss of business from these letters. Well, I think that would have been – to do that would have been probably more convincing to a jury, but I don't need it. According to Shan's – I don't need that. The jury may have that question. The jury may say, well, I don't think I'm going to give them damages because I want to see more evidence. But the case – the seminal case on damages that's similar to this case says, no, I don't have to do that. And that's – there's really no answer to that case. So – I'm not sure how much time I have left. I've got a light on here. So here's what I would say. On the second count of the Consumer Fraud and Deceptive Business Practices Act, there is absolutely no requirement, it's not even arguable, that I have to show specific people that were damaged. That's not a part of that law, and there's no case that says that that I know of. So I think that we've shown the elements, the elements on the case law that actually is accurate, that hasn't been picked up by a word processor and repeated a mistake ten times. I think we have shown the elements of both courts. But certainly on the Consumer Fraud Act, there's really no argument I think that's reasonable that says we haven't shown our damages. The red light's still not on. Some lawyers think they have to keep talking when they don't see that red light. So I – although I've been burned doing that. So here's – as far as the tort of intentional interference,  no restatement second elements require specific parties to be named. Every single case that says a specific party has to be named is on a foundation of sand. It doesn't exist. A prima facie case is established when you show all the elements. We've shown all the elements. And finally, every plaintiff has a right to prove their case by circumstantial evidence. It is circumstantially extremely strong evidence that these body shops all lost the tremendous revenue percentage they lost over the exact same period of time that these lies were being perpetrated. Thank you. You'll have additional time on the panel. Good morning. My name is Roger Heidenreich. I, along with Deborah Campbell, represent the defendants in DAPLEI's Country Mutual and Country Preferred. Let me start with really kind of the last point I think that Mr. Beeman was making, and that's about the Illinois Consumer Fraud Act and what it requires. It requires proximate cause. That's what it requires. Damages have to be proximately caused by the deception. So there still has to be lost business. It still has to be present. So it's no different than the tortious interference claim, which also requires damages resulting from the interference. It's the same type of element. He still has to show that there was lost business here, and they cannot identify lost business. The plaintiffs weren't able to do it. They testified that they didn't know of a single customer they lost because of this form letter. Not a one. Not a one. They also were going to have 28 customer witnesses come into the courtroom and testify that they heard certain things, but that they kept their business with the plaintiffs. Your Honor raises a great point that, well, why don't you go find six because it might show a pattern. They didn't do that. They had the opportunity to do that, but they made a choice, and I don't know what the strategy choice was, but it goes to the circumstantial evidence point. You can't have circumstantial evidence of a non-event to prove an event. You can't have circumstantial evidence that all points to the fact that people stayed to prove that people didn't stay, and that's the fatal flaw, not bringing those people into the courtroom when it comes to this proximate cause point. So what we're left with is an expert, an expert who assumes liability and the fact of damages, and all we're doing is doing this math exercise that compares the percentage of country mutual business in a base year, which, by the way, is different for every one of the plaintiffs, and, by the way, also happens to be the highest year that they had, and then compare that to the percentage of revenue in the actual years. And what you find when you do that is all sorts of anomalies. Your Honor rightly points out, are there other factors? The plaintiffs conceded that in deposition testimony that is in the record and before the court. There are all sorts of other factors. Whether large repair job, whether something was declared a total loss would affect the business that you got from a particular insurer. Did their expert control for those variables? Didn't do anything. Didn't account for them at all. So all that's done, in fact, is that he assumes that it's all due to the conduct. He doesn't account for those variables at all. One interesting form of other factor out there is one of the plaintiffs was actually suing State Farm over similar type of steering conduct, they said. So all that's going out at the same time, too. That's not accounted for either. So during this same time period, one of the plaintiffs was affected by that. But it results in all sorts of anomalies. Let me give you the best example. He pointed out Mr. Knabel's percentage of business went down from 21 to 9%. Well, when you get underneath it and look at the experts' reports and conclusions, you'll see that Mr. Knabel's business from other sources was skyrocketing. He was doing great. The reason he was doing great was that he had become a participant in a direct repair program from State Farm. State Farm's the big company on the block. So his business is skyrocketing. Meanwhile, his country mutual business isn't going down. It's staying pretty much where it was at. It's actually slightly going up. But it's just math. What does that do to the percentage? If his business is skyrocketing from other sources, what does that do to his percentage of country mutual business? Drives it down. Drives it down. And it's got nothing to do with the tortious conduct. But all of that under this damage theory is claimed to be damages. It's all damages. So what Mr. Knabel's done, he's won the lottery. He was able to increase his business, and because he increased his business from other sources, he increased his damages. That's the result of that. That's the anomaly, the sort of anomaly that exists here. Another good example, you talk about taking into account factors. Here's the only time he took into account factors. There's one accounting period where the percentage of country mutual for the Gas Brothers is above the base year. Well, how do you deal with that? Because you can't have kind of positive damages when this is going on. It goes in the opposite direction. So they rely on another factor. It's always the weather. And that was really bad weather. And that affects country mutual more than other companies. So only when they wanted it to increase damages did they consider the other factors. They simply didn't do anything with those factors. Now, the Schatz case was discussed in connection with this damages issue. And it was said that we didn't have a response to the Schatz case, so I think it's important for me to spend a little bit of time on it. The Schatz case got nothing to do with tortious interference, by the way. Not a tortious interference case. So the idea that we're going to find something about specific identity of the lost customers isn't going to be present in that case. It's not a tortious interference case. It's a nuisance case. The case involved nuisance. It involved odors in a theater. And the idea that there wasn't evidence of lost business is just wrong. It's all over the case. In fact, they were handing out refunds to people because of the odors. There were lots of evidence of damage. In that case, then, they used the lost revenues to show damages. There's nothing remarkable about that case at all. Were they required to show that there were people who did not go to the theater? They didn't do it in that way because they just showed lost revenue. But we knew that they had lots of people who complained. They knew they had people who got their money back. That impacted their revenue and certainly would have been damages by itself. So, yeah, there were people. There were people. And it's completely different here where we don't have anybody identified. And yet we end up now with a damage claim of $1.4 million was going to be presented. And when you consider that that's a lost profits claim, that's thousands of repair jobs. Yet, apparently, we can't see it. We can't touch it. We don't know who it is, but it's thousands. That shows you how ludicrous this damage claim was because, at the end of the day, you couldn't connect any of this, what is just a math exercise, to the conduct of the defendants. And for that reason, they don't show damages resulting from the interference. They don't show damages approximately caused by the deceptions. Approximate cause that they're failing to meet. So, counsel, I just want to make sure I'm getting this correctly. Are you saying the distinction with respect to Schatz is the fact that they were able to show that their intake went down, their profit went down, whereas the garages here, their profit didn't necessarily go down except for this analysis, this math calculation that they're doing with respect to country? But we don't have any idea why those numbers are different because there's all sorts of factors. And all the expert did was assume. He assumes liability and the fact of damage, assumes that it was due to the conduct. That's all we know. And because it's just an assumption and because there isn't any other evidence of it, there's just no reason to base that conclusion. It's speculative and it's without foundation. And it's simply not proven. Schatz, we've had people saying, I want my money back. I want my money back. It smells in here, right? And so it's a completely different case. Now, turn to the tortious interference claim and whether one needs to identify specific customers. I think the law is pretty clear here. This strategy choice was made in the face of there being no Illinois case ever, which had said you didn't have to identify specific parties at the summary judgment stage or a trial. And the idea that there isn't anything in Illinois law about this is wrong. The Krinkley case says directly, we note in particular that the court used the term identifiable rather than identified, which to us indicates that the third party's specific identity or name is to be revealed at a subsequent time such as at trial. It needs to be revealed. Ultimately, it's a pleading requirement that you can identify a class of persons. But once you get beyond that stage and you've had, as we did here, nine years of litigation, extensive discovery taken in the case. In fact, this conduct was said to have gone on for 20 years. And despite that, we're going to have no one at the trial testify that their business went somewhere else because of country mutuals conduct. Not one. And that failure is a failure of proof because what the tortious interference tort requires is purposeful interference. But it's not just any conduct that we don't like that you're doing out there in the marketplace. It's purposeful interference that prevents the reasonable expectancy from ripening into a relationship. It's not just any old interference. It's interference that causes the loss of business, that causes the person to go somewhere else. It's an essential part of the tort. And they're just a total failure of proof on it. And to me, I think they consciously decided that they weren't going to do it that way, but they did it that way in the face of this element and in the face of what I think is pretty clear Illinois case law about how this is to be handled. So I think, frankly, is the case that really announces that. But if you put all of these cases into these buckets of motion to dismiss cases and summary judgment cases, it fits that one. And I think it's pretty clear that once we got to trial, they were going to need to do that. And it's perhaps a segue to the form letter as well. Because the form letter, the testimony in the plaintiffs, despite the fact that this form letter had been used since 1999, was that they couldn't identify a single person who didn't come to them because of the form letter. Now, that may be Mr. Beeman yanks two sentences out. But he carefully does not go through the entire letter. And what the interest in the letter says, because after all, this is supposed to be something that's steering people away, here's what it says. We do not have a preferred service provider, and you are free to select any repair facility to perform these repairs. It's just the opposite. It's the anti-steering letter. It says you can go anywhere you want to go. It doesn't say you have to go here. It doesn't say you have to go there. It doesn't suggest people go anywhere else. And Judge Kavanaugh was exactly right on the issue of whether or not this was non-actionable opinion. Because remember, it's not just these two sentences. Let's put it in its entire context, which is what the law requires we do when deciding this issue. The theory is that business was steered away by a combination of a country mutual estimate, a form letter, and then a higher estimate received by the plaintiff. What's an estimate? Under Sampson, Illinois authority is that an estimate is synonymous with the word opinion. Synonymous with opinion. And in fact, when you look at Webster's, it says that an estimate is to arrive at a value judgment that is often valid, but incomplete, approximate, or tentative. That's what an estimate is. It's an opinion. It's an opinion. And the letter, when you read the entire letter, you cannot rip these two sentences out of it without considering everything that it says, makes it clear that it is still an estimate. In fact, the plaintiffs acknowledged that, well, if this was just an estimate and you didn't have this form letter, it would be a different case. I think acknowledging that an estimate is an opinion. So how does the form letter change it? It doesn't change it at all. In fact, the form letter is very careful to say there could be errors. There could be additional accident-related damage. And it tells you what's the process in the event that happens. You work with your repair shop. They talk to the insurance company. And then there's an agreement on a supplemental amount. That sounds like the estimate could be revised. Absolutely what could happen. And the letter talks about that. It's still an opinion. It's non-actionable opinion. And the letter doesn't change that at all. So do these two sentences change it? No, because these two sentences, when read in this entire context, are just broad, generalized expressions of subjective expressions about an opinion. They're opinion about opinion. I mean, think about the words that are being used. Great care. Fair estimate. Properly repair. All those words are words of opinion. Even all parts necessary is something that people differ on. All of these things are matters of opinion. And they are non-actionable. And Judge Kavanaugh was absolutely right to grant a partial summary judgment on that piece of their theory. None of the things that they point to change this. The summary sheets, which they say showed a possibility of supplement, are themselves an opinion. First, they're not definite. Two, they're also an opinion themselves. The fact that certain repairs, like the removal and installation of trim and other items were not included in our estimates, the reason for that is quite simple. Not all repair shops performed those operations. And until we knew the identity of the repair shop, we weren't going to include items for repairs that were never going to be done. But the letter explains how that gets done. It's performed. It gets supplemented. And then finally, this idea that there were amounts in estimates versus final bills, we were going to have at trial literally hundreds of exhibits where an initial estimate was X and the final bill was greater. And that was supposed to be some indication that this was all false. But that, after the fact analysis, is absolutely meaningless. In fact, all it shows is that the letter was followed, a supplemental amount was paid, and they kept the business because all of those exhibits were going to be business they kept and business they got at a higher amount. Red as a whole, which I believe the court has to do, that is the estimates, the form letter, are all non-actionable opinion, and the judge was correct on that issue. Unless there are any questions, we would ask that it be affirmed. I don't see anything. Thank you. I think that Mr. Heidenreich was doing pretty good until he tried to pass off the idea that these are opinions when they're falsehoods. You can't have an estimate including the value of a building and know that the building has structural problems and not put that in your estimate. And that's what happened here. They knew things were false, and they put them in the estimate. You can't say, oh, you know, down in the small print, down after we tell you, hey, we've done a thorough investigation and you went through a red light, and we know from our investigation that you went through a red light, but you know what, if you want to call us and talk about it, you can. You still, what you've done is had a falsehood to start with, assuming they went through a green light, and then you try to, through legalese, try to get out of a situation where you've lied to them. And unfortunately, that's what's been happening here for a long, long time. As with respect to the Consumer Fraud Act, Mr. Heidenreich only mentioned, well, you've got to prove proximate cause. Well, that's what we've proven. That's up to a jury or a judge. That's not something normally that the appellate court decides. That's something that is normally decided by the trier of fact. In this case, we have shown damages. Whether or not those damages would be accepted is up to the trier of fact. That is normally the way cases are handled, and that should be the way it's handled in this case. He talks about variables. Look at the variables in the Shantz case. They had no evidence as to possible wages paid, tax rates, or other costs of doing business. There was no evidence of what pictures were being shown. Were they showing a terrible movie, and that's why the attendance was down? We don't know. Or were they showing the Titanic, where everybody's flocking to the theater? We don't know that either. That wasn't shown. The court ruled it doesn't have to be shown. They only counted grocery seats. Yeah, a couple people wanted their money back, but no one testified they didn't go to the theater because of the smell from the factory that was near the theater. No one. That was found to be approximate causation. In fact, some were generally reversed because it was up to the jury to decide that that was approximate cause. With respect to the issue of whether you have to show specific persons in the count of tortious interference with business, I will stand by what I told you. If you look at every case that says that, it counts on for a basis a case that never said that. It's just a repeated mistake of paste and copy, and you can't go back to a case that really says that. And that I don't think is the law. I don't think it should be the law. And as far as individual people, the statement was made that we have found no people that didn't come here, and that's not entirely correct. If you look at our brief, we named several people whose business was pulled from the shops. We elected not to use those. Let's say we would have made $400 on that or $500 on that repair or $1,000 on that repair. We didn't put that in as far as our damages, but we did show people. We have people who say they didn't come because of this hassle. And it's in the brief, and you can see it in there. And there's more than one or two. There's probably more than people in the theater ask for their money back. He says you can't take an event from a non-event. We have an event here. I think the real purveying question is can a company get away with this? Can you tell falsehoods in an effort to get business? And when we talk about falsehoods, we know it's profit-driven, and we know because of the individual, Mr. Bruce Lair, who was a customer of Gas Auto Body. The country gave him an estimate for $1,900. And we know that estimate's low because it doesn't include a whole bunch of stuff they say it's supposed to include and that they admit is necessary for a proper repair. And yet, unbeknownst to the owner of the vehicle, they shopped that car to three other body shops and came up with estimates, well, I'll fix the car for $800. I'll fix the car for $900. Over $1,000 under the country estimate, which is bogus. So this is proof that all this is is an effort to try to get the lowest common denominator, and that's further circumstantial evidence of damage. Thank you. We'll take this matter under advisement, stand in recess until the readiness of the next case.